## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFEND ARLINGTON, C/O SAVE SOUTHERN HERITAGE FLORIDA *et al.*, and ROY P. HUDSON *et al.*, Plaintiffs, v. UNITED STATES DEPARTMENT OF DEFENSE *et al.*, Defendants. | Civil Action Nos. 23-441, 23-2094 (BAH) Judge Beryl A. Howell |

## MEMORANDUM OPINION

Section 370 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), enacted on January 1, 2021, requires the Secretary of Defense to "establish a commission relating to assigning, modifying, or removing of names, symbols, displays, monuments, and paraphernalia to assets of the Department of Defense that commemorate the Confederate States of America [(commonly referred to as the 'Confederacy')] or any person who served voluntarily with the Confederate States of America."  Pub. L. No. 116-283, § 370(b), 134 Stat. 3388, 3553 (2021).  This Naming Commission (the "Commission") is required, among other things, to "develop a plan to remove [these] names, symbols, displays, monuments, or paraphernalia" and "present a briefing and written report" to the Committees on Armed Services of the Senate and House of Representatives.  *Id.* § 370(c)(4), (g).  At least 90 days after this briefing and written report, but "[n]ot later than three years after the date of the enactment of this Act," *i.e.*, January 1, 2024, "the Secretary of Defense shall implement the plan submitted by the commission . . . and remove all names, symbols, displays, monuments, and

paraphernalia that honor or commemorate the Confederate States of America . . . or any person who served voluntarily with the Confederate States of America from all assets of the Department of Defense." *Id.* § 370(a), (g).

Over one year ago, on September 19, 2022, the Naming Commission published the third and final part of its Final Report to Congress (the "Final Report" or "Report"), which considered all Department of Defense ("DOD") assets that had not already been addressed in the first two parts. *See* Notice of Refiling of Exhibit, Ex. 1 ("Final Report"), ECF No. 30-1.  In relevant part, the Report concluded that the Confederate Memorial (the "Memorial"), erected in 1914 in Section 16 of the Arlington National Cemetery ("ANC"), was a monument "within its remit" that "offers a nostalgic, mythologized version of the Confederacy, including highly sanitized depictions of slavery." *Id.* at 15.  After "explor[ing] alternatives . . . to removal," such as contextualizing the Memorial, and examining whether removal would cause "any disturbance to adjacent graves," the Commission recommended that "[t]he statute atop of the monument" and "[a]ll bronze elements on the monument" be removed, but "preferably leaving the granite base and foundation in place to minimize risk of inadvertent disturbance to graves." *Id.* at 16.

On October 6, 2022, Secretary of Defense Lloyd Austin issued a memorandum "concur[ring] with all of the Naming Commission's recommendations," "committ[ing] to implementing all of the Commission's recommendations as soon as possible," and "direct[ing] the relevant DoD and Office of the Secretary of Defense (OSD) Component heads to begin planning for [such] implementation" ("October 2022 Memorandum").  *See* Defs.' Mot. to Dismiss, Ex. 2 at 1 ("Oct. 2022 Memo"), ECF No. 10-2; *see also* Compl. ¶ 30 ("D.A. Compl."), ECF No. 1.[1]  On January 5, 2023, Under Secretary of Defense for Acquisition and Sustainment

---

[1]     All ECF numbers refer to the consolidated docket in *Defend Arlington v. Department of Defense*, No. 23-cv-441, unless otherwise noted.

William LaPlante directed all DOD organizations to use existing military resources to begin full implementation of the Naming Commission's recommendations, including with respect to the Memorial.  *See* D.A. Compl. ¶ 30.

Two sets of plaintiffs brought actions against the DOD, Secretary of Defense Lloyd Austin, Under Secretary of Defense for Acquisition and Sustainment William LaPlante, the United States Department of the Army (the "Army"), and Secretary of the Army Christine Wormuth, alleging that defendants' decision to implement the Naming Commission's recommendation to remove immediately the Memorial from the ANC violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq.*; and the Federal Advisory Committee Act of 1972 ("FACA"), Pub. L. No. 92-463.  *See* D.A. Compl. ¶¶ 1, 95–131; Compl. ¶¶ 1, 101–21 ("Hudson Compl."), *Hudson v. Dep't of Defense*, No. 23-cv-2094, ECF No. 1.  Plaintiffs in *Defend Arlington v. Department of Defense*, No. 23-cv-441, are Defend Arlington; Save Southern Heritage Florida; Friends of Judah P. Benjamin Camp of the Sons of Confederate Veterans; Harold Edgerton; Edwin Kennedy, Jr.; Richard Moomaw; and Teresa Roane ("Defend Arlington Plaintiffs"), all of whom share related missions "dedicated to the preservation of Southern-American heritage and Confederate and Jewish Veterans," "to preserve the history of the South for future generations," and "to defend the good name of the Confederate Veteran and preserve their history into future generations."  D.A. Compl. ¶¶ 4, 8, 12.  Plaintiffs in *Hudson v. Department of Defense*, No. 23-cv-2094, are Roy Hudson Jr.; Derek Underwood; Steven Heishman; Britton Earnest Sr.; and the Sons of Confederate Veterans, Inc. ("Hudson Plaintiffs"); the individuals are descendants of confederate soldiers, and the Sons of Confederate Veterans,

Inc. is a nonprofit fraternal organization "with a mission to honor and protect the legacy of those who had fought for the Confederacy."  Hudson Compl. ¶¶ 4–24.

Pending before this Court are three motions.  First, defendants have moved to dismiss the complaint in *Defend Arlington* for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Mot. to Dismiss ("Defs.' D.A. Mot."), ECF No. 10; Pls.' Corrected Opp'n Defs.' Mot. to Dismiss ("Pls.' D.A. Opp'n"), ECF No. 14; Defs.' Reply Supp. Mot. to Dismiss ("Defs.' D.A. Reply"), ECF No. 15.  Second, defendants have moved to dismiss the complaint in *Hudson* on the same grounds.  *See* Defs.' Mot. to Dismiss ("Defs.' Hudson Mot."), ECF No. 29; Pls.' Opp'n Defs.' Mot. to Dismiss ("Pls.' Hudson Opp'n"), ECF No. 23; Defs.' Reply Supp. Mot. to Dismiss ("Defs.' Hudson Reply"), ECF No. 26.[2]  Third, plaintiffs have moved, pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65.1(c), for a preliminary injunction "to preserve the status quo" and enjoin defendants, "their representatives, contractors, agents, employees, or others acting at the behest of or with permission of [d]efendants, from taking any further actions to tear down, remove, deconstruct, destroy, or otherwise alter the object of this controversy—the Confederate Reconciliation Memorial and grave marker located at Section 16 of Arlington National Cemetery—pending a final resolution of this action."  Pls.' Mot. for Prelim. Inj. at 1 ("Pls.' PI Mot."), ECF No. 27; *see also* Pls.' Mem. Supp. Mot. for Prelim. Inj.

---

[2]    Defendants' motion to dismiss was filed in *Hudson v. Department of Defense*, No. 23-cv-2094, before the case was designated related to and eventually consolidated with *Defend Arlington v. Department of Defense*, No. 23-cv-441.  *See* Reassignment of Civil Case, *Hudson*, No. 23-cv-2094, ECF No. 23; Min. Order (Aug. 22, 2023), *Defend Arlington*, No. 23-cv-441.  Defendants' motion to dismiss *Hudson* was not docketed on the consolidated *Defend Arlington* docket until November 27, 2023, after plaintiffs filed their opposition and defendants filed their reply, which is why plaintiffs' opposition (ECF No. 23) and defendants' reply (ECF No. 26) have lower docket numbers than defendants' motion to dismiss (ECF No. 29), despite defendants' motion having been filed earlier.

("Pls.' PI Mem."), ECF No. 27-4; Defs.' Opp'n Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 31; Pls.' Reply Supp. Mot. for Prelim. Inj. ("Pls.' PI Reply"), ECF No. 33.[3]

For the reasons below, defendants' motions to dismiss are granted, and plaintiffs' motion for a preliminary injunction is denied as moot.

# I.   BACKGROUND

The relevant statutory and regulatory framework, as well as the facts from which this litigation arises, are presented below.

## A.   Factual Background

### 1.   *The NDAA and the Naming Commission's Recommendations*

Passed over then-President Trump's veto and enacted on January 1, 2021, NDAA § 370 requires the Secretary of Defense to "establish a commission relating to assigning, modifying, or removing of names, symbols, displays, monuments, and paraphernalia to assets of the Department of Defense that commemorate the Confederate States of America or any person who served voluntarily with the Confederate States of America."  NDAA § 370(b).  The Naming Commission's duties, outlined in subsection (c), include: (1) assessing the cost of such renaming or removal; (2) developing procedures and criteria to determine where naming or removal might be necessary; (3) recommending procedures for renaming assets "to prevent commemoration" of the Confederacy; (4) developing a plan for any removal "within the timeline established" by the NDAA; and (5) incorporating into the plan "procedures and criteria for collecting and

---

[3]     The *Defend Arlington* complaint and the *Hudson* complaint are the same in all material respects.  *Compare* D.A. Compl., *with* Hudson Compl.  The same is true for defendants' motions to dismiss and accompanying exhibits in *Defend Arlington* and *Hudson*, *compare* Defs.' D.A. Mot., *with* Defs.' Hudson Mot.; plaintiffs' opposition; *compare* Pls.' D.A. Opp'n, *with* Pls.' Hudson Opp'n; and defendants' reply, Defs.' D.A. Reply, *with* Defs.' Hudson Reply.  All the briefs have been reviewed, but for citation simplicity, the papers in both cases are cited only where the plaintiffs' arguments differ.  Similarly, each declaration and the associated exhibits supporting the parties' positions with respect to defendants' motions to dismiss and plaintiffs' request for a preliminary injunction have been reviewed, but only those declarations and exhibits necessary for resolution of the instant motions are cited.

incorporating local sensitivities associated with naming or renaming of assets of the Department of Defense." *Id.* § 370(c).  The NDAA specifically exempts "grave markers" for required renaming or removal and instructs the Naming Commission to "define what constitutes a grave marker." *Id.* § 370(j).

Under NDAA § 370, the Naming Commission is required to brief Congress, by October 1, 2021, about their progress, and to present, by October 1, 2022, "a briefing and written report detailing the results of the requirements under subsection (c)." *Id.* § 370(g); *see also id.* § 370(c).  The "briefing and written report" must include: (1) a list of assets to be removed or renamed; (2) the associated costs; (3) the criteria and requirements to nominate and rename the assets; and (4) the methods of collecting and incorporating local sensitivities associated with the removal and renaming of these assets.  *Id.* § 370(g).

At least 90 days after publication of the "written report" to Congress, but within three years of the NDAA's enactment, *i.e.*, before January 1, 2024, the Secretary of Defense "shall implement" the Naming Commission's plan and "remove" from all DOD assets "all names, symbols, displays, monuments, and paraphernalia that honor or commemorate the Confederate States of America . . . or any person who served voluntarily with the Confederate States of America." *Id.* § 370(a), (g).

On September 19, 2022, the Naming Commission published the third and final part of its Final Report to Congress, having addressed, in Part I, United States Army Bases and, in Part II, the United States Military Academy and Naval Academy.  In Part III, the Naming Commission considered all DOD assets that had not already been addressed in Parts I and II.  *See* Final Report at 2.[4]  Part III begins by setting forth, in detail, the Commission's methodology for complying

---

[4]      The complaints refer to the Final Report using a Google Drive link, *see* D.A. Compl. ¶ 30 n.4; Hudson Compl. ¶ 45 n.6, and while defendants' attach the Final Report as an exhibit to their motion to dismiss, the exhibit

with NDAA § 370, including describing the Commission's renaming and removal criteria and plan and the associated costs.  *See id.* at 4–6.  Among the removal criteria, for example, included whether the asset is "designated as one that honors or commemorates the Confederacy"; whether the asset is a grave marker; whether "[t]he commemoration of the Confederacy . . . is the core purpose and presentation of the asset"; whether "[r]emoval is reasonably necessary to expunge the commemoration"; and the historical context of the original naming decision.  *Id.* at 4.

The Commission also explained the steps it took to comply with NDAA § 370's requirement to collect and incorporate local sensitivities, such as by visiting every site "known to possess Confederacy-affiliated assets" to engage with "base leaders, personnel and other on-post stakeholders," and "local community leaders and other off-post stakeholders"; by speaking with "senators, representatives, and governors for the respective states . . . to educate them on the Commission's mandate and upcoming engagements with bases and local communities in their jurisdiction" and "to obtain feedback from these elected officials"; and by "establish[ing] a website allowing anyone to provide installation name recommendations (or other feedback) directly to the Commission from September 4 to December 1, 2021."  *Id.* at 5–6.

Among the assets addressed in the Report includes the Confederate Memorial, which was erected in 1914 and remains located in Section 16 of the ANC, a section specifically authorized by Congress in 1900 for the reinterment of Confederate remains.  *See id.* at 15; D.A. Compl. ¶ 42 (explaining that Section 16 was "specially set aside and designated by Congress to reinter the remains of approximately 260 confederate soldiers who died in prisoner of war camps and in

---

omits the Report's page numbers, *see* Defs.' Mot. to Dismiss, Ex. 1, ECF No. 10-1.  At the Court's request, plaintiffs filed a copy of the Final Report with the correct pagination.  *See* Notice of Refiling of Exhibit, Ex. 1, ECF No. 30-1.  For consistency in pagination with the parties' briefing, citations to the Final Report will be to this refiled exhibit.

hospitals and battlefields near Arlington" and "is now the site of nearly 500 interments").[5]

Describing the Memorial, the Report stated:

> Standing on a pedestal, a bronze, classical female figure, crowned with olive leaves, represents the American South.  The monument's pedestal features 14 shields, engraved with the coats of arms of the 11 Confederate states, plus Kentucky, Maryland and Missouri.  Although distinct minorities in those three states chose to support the Confederacy, the substantial majority of their respective leadership and citizenry remained within—and in overwhelming support of—the United States.  The memorial's inclusion of the heraldry from those states distorts history by inflating the Confederacy's size, support and significance.
>
> Thirty-two life-sized figures depict mythical gods alongside Southern soldiers and civilians.  Two of these figures are portrayed as African-American: an enslaved woman depicted as a "Mammy," holding the infant child of a white officer, and an enslaved man following his owner to war.  An inscription of the Latin phrase "*Victrix causa diis placuit sed victa Caton*"—which means, "*The victorious cause was pleasing to the gods, but the lost cause to Cato*"—construes the South's secession as a noble "Lost Cause."  This narrative of the Lost Cause, which romanticized the pre-Civil War South and denied the horrors of slavery, fueled white backlash against Reconstruction and the rights that the 13th, 14th and 15th Amendments (1865–1870) had granted to African-Americans.  The image of the faithful slave, embodied in the two figures on the memorial, appeared widely in American popular culture during the 1910s through 1930s, perhaps most famously in the 1939 film "Gone with the Wind."

Final Report at 15–16.  Based on these characteristics, the Naming Commission found that the Memorial "offers a nostalgic, mythologized vision of the Confederacy, including highly sanitized depictions of slavery" and concluded that the Memorial is a "monument" "within its remit."  *Id.* at 15.

The Commission "explore[d] alternatives . . . to removal," such as leaving the Memorial in place or contextualizing the Memorial, and discussed whether removal of the Memorial would

---

[5]    Established in 1864, the Arlington National Cemetery is one of two cemeteries in the United States National Cemetery System under the jurisdiction of the Army and is the final resting place for more than 300,000 veterans.  *See* D.A. Compl. ¶¶ 22 & n.3, 40 & nn. 6–7.

cause "any disturbance to adjacent graves" (concluding that it would not).  *Id.* at 16.  The

Naming Commission ultimately made three recommendations:

> [1] The statue atop of the monument should be removed.  All bronze elements on the monument should be deconstructed, and removed, preferably leaving the granite base and foundation in place to minimize risk of inadvertent disturbance of graves.
> [2] The work should be planned and coordinated with the Commission of Fine Arts and the Historical Review Commission to determine the best way to proceed with removal of the monument.
> [3] The Department of Army should consider the most cost-effective method of removal and disposal of the monument's elements in their planning.

*Id.*

### 2.    *Defendants' Implementation of the Commission's Recommendations*

On October 6, 2022, Secretary of Defense Austin issued a memorandum "concur[ring]

with all of the Naming Commission's recommendations," "committ[ing] to implementing all of

the Commission's recommendations as soon as possible, subject to the expiration of the 90-day

waiting period mandated by section 370(g), and no later than January 1, 2024," and "direct[ing]

the relevant DoD and Office of the Secretary of Defense (OSD) Component heads to begin

planning for [such] implementation."  *See* Oct. 2022 Memo at 1.  On January 5, 2023, after the

90-day waiting period expired, Under Secretary LaPlante directed all DOD organizations to use

existing military resources to begin full implementation of the Naming Commission's

recommendations, including with respect to the Memorial.  *See* D.A. Compl. ¶ 30; Hudson

Compl. ¶ 45.

The Army, which has jurisdiction over the ANC pursuant to 10 U.S.C. § 7721 and is thus

responsible for implementing the Commission's recommendations with respect to the ANC,

conducted FACA, NEPA, and NHPA review to evaluate the means and method of removal.  As

to FACA, the Army participated in a meeting of a Federal Advisory Committee established for

the ANC ("FACANC") on November 7 and 8, 2022.  *See* Meeting Notice, 87 Fed. Reg. 64019, 64019 (Oct. 21, 2022).

As to NEPA, the Army published, on August 4, 2023, a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS").  *See* Notice of Intent, 88 Fed. Reg. 51786, 51786 (Aug. 4, 2023).  The Army announced, on November 3, 2023, its intent to withdraw the NOI, however, reasoning that an EIS is "not needed to inform any decision-making for this action," since "the congressionally-mandated removal action is a non-discretionary action." Withdrawal of Notice of Intent, 88 Fed. Reg. 75564, 75565 (Nov. 3, 2023).  Insofar as there are discretionary elements to the proposed action, the Army concluded that "no reasonably foreseeable significant impacts" exist but nonetheless committed to preparing an Environmental Assessment "to analyze and disclose any effects of the discretionary elements of the proposed action, including how to dissemble the Confederate Memorial."  *Id.*  On November 17, 2023, the Army published a Final Environmental Assessment and draft Finding of No Significant Impact ("FONSI").  *See* Defs.' Opp'n Pls.' Mot. for Prelim. Inj., Ex. B ("Final EA"), ECF 31-2; Defs.' Opp'n Pls.' Mot. for Prelim. Inj., Ex. C, ECF 31-3.  The Army accepted comment on the draft FONSI until December 2, 2023, and intends to issue a final FONSI around December 8, 2023. *See National Environmental Policy Act (NEPA) Process*, Arlington Nat'l Cemetery, https://www.arlingtoncemetery.mil/About/Confederate-Memorial-Removal/NEPA.

Finally, as to NHPA, the Army solicited, from October 4 to November 21, 2023, comment "to seek input and information regarding the identification of, and potential effects to, historic properties associated with" removal of the Memorial.  *National Historic Preservation Act (NHPA) Process*, Arlington Nat'l Cemetery, https://www.arlingtoncemetery.mil/About/Confederate-Memorial-Removal/NHPA-Section-106.

The Army has further coordinated with the Virginia State Historic Preservation Office, which concurred with the Army's determination about potential adverse effects and is working with Army to resolve these effects by December 14, 2023.  *See* Defs.' Opp'n Pls.' Mot. for Prelim. Inj., Ex. A ¶ 4 ("Durham-Aguilera Decl."), ECF No. 31-1; Defs.' Opp'n Pls.' Mot. for Prelim. Inj., Ex. D, ECF No. 31-4.

The Army "anticipates proceeding with the removal of the Memorial in the manner described in the Final EA, the final FONSI, and the final [programmatic agreement between the Virginia State Historic Preservation Office and the Army] on or around December 18, 2023." Defs.' PI Opp'n at 7 (citing Durham-Aguilera Decl. ¶ 5).

### B.    Procedural Background

On February 16, 2023, the Defend Arlington Plaintiffs filed their complaint against the DOD, the Army, and Secretary Austin, Under Secretary LaPlante, and Secretary Wormuth, each in their official capacity, alleging, in four counts, that defendants' decision to implement the Naming Commission's recommendation to remove immediately the Memorial from the ANC violated the APA, NEPA, NHPA, and FACA.  *See* D.A. Compl. ¶¶ 1, 95–131.  Specifically, plaintiffs contend that defendants allegedly (1) ignored the NDAA's directive to consider local sensitivities and to exclude from removal grave markers; (2) failed to consider environmental impacts and alternative actions as required by NEPA § 102; (3) failed to consider the impact of removal on historic and cultural resources as required by NHPA § 106; and (4) denied the opportunity to receive independent advice and recommendations from a FACANC in violation of FACA regulations.  Counts I and II allege that defendants' decision to remove the Memorial, in the context of these alleged failures, was arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), and in excess of their statutory authority, in violation of 5 U.S.C. § 706(2)(C).  *See*

11

D.A. Compl. ¶¶ 95–105 (Count I), 106–17 (Count II).[6]  Counts III and IV bring the

corresponding claims under NEPA and NHPA respectively.  *See id.* ¶¶ 118–23 (Count III), 124–

31 (Count IV).  On May 26, 2023, defendants moved to dismiss the complaint for lack of

standing pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Defs.' D.A. Mot. at 1.

On March 6, 2023, the Hudson Plaintiffs filed a complaint in the District Court for the

Eastern District of Virginia against the same defendants, bringing the same four claims under the

APA, NEPA, and NHPA, based on the removal of the Memorial.  *See* Hudson Compl. ¶¶ 1, 101–

21.  The case was transferred to this Court on July 20, 2023, *see* Transfer Order, *Hudson*, No. 23-

cv-2094, ECF No. 18, and defendants, on July 28, 2023, moved to dismiss the complaint

pursuant to Rule 12(b)(1) and (6) on substantially the same grounds as in *Defend Arlington*, *see*

Defs.' Hudson Mot. at 1.

On August 22, 2023, upon consideration of defendants' unopposed motion to consolidate

the cases, the cases were consolidated.  *See* Defs.' Unopposed Mot. to Consolidate Cases, ECF

No. 19; Min. Order (Aug. 22, 2023).

On November 21, 2023, approximately a month and a half after defendants' motion to

dismiss became ripe, plaintiffs moved, pursuant to Federal Rule of Civil Procedure 65(a) and

Local Rule 65.1(c), for a preliminary injunction to enjoin the removal of the Memorial.  *See* Pls.'

PI Mot. at 1.  Specifically, they seek to enjoin defendants, "their representatives, contractors,

agents, employees, or others acting at the behest of or with permission of [d]efendants, from

taking any further actions to tear down, remove, deconstruct, destroy, or otherwise alter" the

Memorial, "pending a final resolution of this action."  *Id.*

---

[6]      Count II includes allegations that defendants violated NDAA, NEPA, and NHPA, but no such allegations
about FACA.

The parties concurrently moved for an expedited hearing on the preliminary injunction motion, *see* Joint Mot. to Expedite, ECF No. 28, but failed to include "a statement of the facts which make expedition essential," as required by Local Civil Rule 65.1(d).  To be clear, the "emergency" nature of plaintiffs' request was one of their own creation.  Plaintiffs, for example, filed suit approximately five to six months after the Naming Commission submitted Part III of its Final Report, despite NDAA § 370's direction that the Naming Commission's recommendations "shall" be "implement[ed]" by January 1, 2024.  Although the Defend Arlington Plaintiffs relatively promptly opposed defendants' motion to dismiss, the Hudson Plaintiffs opposed defendants' motion four weeks late and only at the prompting by the Court's order to show cause.  *See* Min. Order (Aug. 30, 2023).  For these reasons, coupled with a district court's inherent authority to manage its congested docket, the parties' motion for an expedited hearing was denied.  *See* Min. Order (Dec. 1, 2023).  Nonetheless, defendants' two pending motions to dismiss and plaintiffs' pending motion for a preliminary injunction are decided in accordance with the expedited schedule requested by the parties.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Federal courts are "courts of limited jurisdiction, possessing only that power authorized by Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted). "[F]orbidden . . . from acting beyond [their] authority," *NetworkIP, LLC v. Fed. Commc'n Comm'n*, 548 F.3d 116, 120 (D.C. Cir. 2008), federal courts thus "have an affirmative obligation to consider whether the constitutional and statutory authority exist for us to hear each dispute," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (citation omitted).  Absent

subject-matter jurisdiction, a case must be dismissed.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3).

Article III, Section 2 of the United States Constitution authorizes federal courts to adjudicate "Cases" or "Controversies."  U.S. Const. art. III, § 2; *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc))).   A plaintiff's standing to pursue a claim is "an essential and unchanging" element of the bedrock cases-or-controversy requirement.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Put differently, if a plaintiff does not have standing, the court lacks subject-matter jurisdiction over a claim, and the case must be dismissed.

Where a plaintiff's standing is challenged, the court "must assume that [the plaintiff] states a valid legal claim."  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  "Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original accepted) (quoting *Lujan*, 504 U.S. at 561). Where the plaintiff's standing is challenged under Rule 12(b)(1), the court must thus "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In addition, to assure itself of its jurisdiction over a claim, "the district court may consider materials outside the pleadings."  *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B.       Motion to Dismiss for Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (citation omitted). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construing all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). A court, however, does not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original accepted and citation omitted); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

### C.       Preliminary Injunction for Relief Under the APA

The APA authorizes any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," to seek "judicial review thereof."  5 U.S.C. § 702.  Actions subject to review include "final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  A "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  *Id.* § 706.  The "court shall [ ] compel agency action unlawfully withheld or unreasonably delayed; and [ ] hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority."  *Id.* § 706(1)– (2)(A), (C).

"Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.'"  *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) (alteration in original accepted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)).  A court engaged in arbitrary and capricious review "must 'not substitute its own judgment for that of the agency,'" and "ordinarily uphold[s] an agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'"  *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alterations in original accepted) (quoting *State Farm*, 463 U.S. at 43).

"A party seeking a preliminary injunction must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). When a plaintiff moves for a preliminary injunction, the plaintiff's claims are typically evaluated "under the heightened standard for evaluating a motion for summary judgment." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015). In cases where a moving party has filed only its complaint and "moved for a preliminary injunction contemporaneously," any challenge to standing must be "evaluated under the motion to dismiss standard," pursuant to Rule 12(b)(1), because "the litigation ha[s] not proceeded past the pleadings stage." *Id.* at 913.

## III. DISCUSSION

At the outset, plaintiffs clarify in opposition to defendants' motions to dismiss that they allege only that Secretary Austin's October 2020 Memorandum, which directed the implementation of the Naming Commission's recommendations, violates the APA (Counts I and II), NEPA (Count III), and NHPA (Count IV). *See* Pls.' D.A. Opp'n at 2 ("Because the important action taken by the Secretary of Defense in a memorandum dated October 6, 2022 . . . is a final agency action subject to review by this Court, the Defendants' motion to dismiss should be denied."), 4 ("The DOD October 6, 2022, action is [a] final agency action for which Plaintiffs seek judicial review."), 8 ("Secretary Austin's Memorandum is a final decision of the Department for which judicial review is appropriate. Plaintiffs seek this Court's review of that decision."); Pls.' Hudson Opp'n at 17–25 (same).[7] Defendants move to dismiss these claims for

---

[7] Nowhere in opposition do plaintiffs challenge Under Secretary LaPlante's January 2023 Memorandum. Any APA, NEPA, or NHPA claim based on Under Secretary LaPlante's memorandum is thus dismissed as conceded. *See CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996) (explaining that

lack of standing, pursuant to Rule 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6).  Standing, a threshold jurisdictional issue, will first be considered, *see Deutsche Bank Nat'l Trust Co. v. Fed. Deposit Ins. Corp.*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013), before turning to the merits of plaintiffs' APA, NEPA, and NHPA claims.

### A.      Standing

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted). "The doctrine of standing gives meaning to these constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (alteration in original accepted and citation omitted). Constitutional standing has three elements: (1) injury-in-fact, *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized," and "(b) actual or imminent, not conjectural or hypothetical"; (2) causation, *i.e.*, "a causal connection between the injury and the conduct complained of"; and (3) redressability, *i.e.*, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61 (citations omitted).  The party invoking federal jurisdiction—here, plaintiffs—bears the burden of establishing all three elements.  *Id.* at 561.

---

when a party fails to respond to an argument raised by another party, or even when the response is "somewhat half-hearted," the party has "waived the issue").

    In addition, although both parties spend much of their briefing discussing the government's process of evaluating the appropriate method of removing the Memorial, this conduct that occurred after the October 2022 Memorandum is not relevant to plaintiffs' claims, which concern the removal of the Memorial, not the means by which removal will occur.  *See* Defs.' D.A. Mot. at 23–26; Defs.' D.A. Reply at 10–11; Pls.' PI Mem. at 22–26; Defs.' PI Opp'n at 12–15.  The numerous rounds of briefing have obscured the core issue in dispute: whether the October 2020 Memorandum, which directs the implementation of the Naming Commission's recommendations, including the removal of the Memorial, violated the APA, NHPA, and NEPA.

Where, as here, plaintiffs frame their claims in terms of procedural injury, the redressability requirement is "relaxed," and plaintiffs "need only show that correcting the alleged procedural violation *could* still change the substantive outcome in plaintiff's favor not that it *would* effect such a change." *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (alteration in original accepted and citation omitted); *see also Bentsen*, 94 F.3d at 668 (explaining that procedural violations are generally "easily redressable, as a court may order the agency to undertake the procedure"). "Although the plaintiff in a procedural-injury case is relieved of having to show that proper procedures would have caused the agency to take a different substantive action, the plaintiff must still show that the agency action was the case of some redressable injury to the plaintiff." *Hawkins*, 991 F.3d at 225 (alteration in original accepted) (quoting *Arpaio*, 797 F.3d at 21).

Defendants argue that plaintiffs' alleged injury is not redressable because NDAA § 370 requires the Secretary of Defense, without discretion, to implement the recommendations of the Naming Commission, including its recommendation to remove the Memorial. Defs.' D.A. Mot. at 9, 19. In so arguing, defendants misunderstand the "fairly traceable" requirement, which "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Defendants cannot argue that the Commission's recommendation was an "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted); *see also Nat'l Parks Conservation Ass'n v. Mason*, 414 F.3d 1, 6 (D.C. Cir. 2005) (explaining that the third party must be a "truly independent actor" to "destroy the causation required for standing"). Put differently, the fact that the Secretary of Defense merely implemented recommendations that the Naming Commission made is insufficient to defeat plaintiffs' allegations of redressability. Rather, "assum[ing] that a

decision on the merits would be favorable" to plaintiffs and that "the requested relief"—enjoining the removal of the Memorial—would be granted, "that relief would be likely to address the party's injury." *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989).  Plaintiffs have thus "met their burden—which is relatively modest at this stage of the litigation—of alleging that their injury is 'fairly traceable'" to the October 2022 Memorandum.  *Bennett*, 520 U.S. at 171; *see also Thornburgh*, 869 F.2d at 1511 (examining the government's assertion that "no relief is available in this case" on the merits and not "under the rubric of standing doctrine").

## B.   Claims Under the Administrative Procedure Act (Counts I and II)

Plaintiffs allege that the October 2022 Memorandum, which concurred with the Naming Commission's recommendations and directed their implementation, was arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), and in excess of statutory authority, in violation of 5 U.S.C. § 706(2)(C).  *See* Pls.' D.A. Opp'n at 7–8 & n.2; Pls.' Hudson Opp'n at 17–18.  According to plaintiffs, "[t]he NDAA is clear that the Secretary's authority extended only to those recommendations that were consistent with criteria Congress established."  Pls.' D.A. Opp'n at 11; Pls.' Hudson Opp'n at 24.  Put differently, plaintiffs contend that Secretary Austin had an independent obligation to examine the Naming Commission's recommendations to ensure their compliance with the "duties" that Congress established for the Commission, such as the Commission's obligation to "include in the plan procedures and criteria for collecting and incorporating local sensitivities associated with naming or renaming of assets" and to "exempt grave markers," a term to be defined by the Commission.  *See* Pls.' D.A. Opp'n at 11; *see also* NDAA § 370(c)(5), (g)(4), (j).  By "implementing" the Commission's recommendations, which plaintiffs allege were procedurally flawed, DOD, too, allegedly "violate[d]" NDAA § 370.  D.A. Compl. ¶¶ 32–34; Pls.' D.A. Opp'n at 5.

Plaintiffs' argument is not persuasive.  Assuming, without deciding, that the October 2022 Memorandum was a "final agency action," DOD followed an unambiguous statutory command, and its actions thus cannot be considered arbitrary or capricious or in excess of statutory authority.[8]

The parties' dispute turns on a question of interpretation.  When construing a statute, the plain meaning of the text controls.  *United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("If the statutory language is plain, we must enforce it according to its terms.").  "If the language of the statute has a 'plain and unambiguous meaning,' our inquiry ends so long as the resulting 'statutory scheme is coherent and consistent.'"  *Barnes*, 295 F.3d at 1359 (quoting *United States v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002)).

NDAA § 370 proscribes a limited role for DOD in the removal and renaming of items that honor or commemorate the Confederacy: (1) establish the Naming Commission, *see* NDAA § 370(b); (2) appoint four (of eight) members to the Commission, *see id.* § 370(d)(1); and (3) "implement the plan submitted by the commission" no later than "three years after the date of the enactment of this Act," *see id.* § 370(a).  *See* Pls.' D.A. Opp'n at 8 n.2 (acknowledging that "[t]he NDAA assigned the DOD two tasks: establish the Naming Commission and [] implement the Naming Commission recommendations").  With respect to implementation, NDAA § 370 states: "the Secretary of Defense shall implement the plan submitted by the [Naming Commission] and remove all names, symbols, displays, monuments, and paraphernalia that

---

[8]      Defendants argue that the October 2022 Memorandum is not a "final agency action" under the APA.  *See* Defs.' D.A. Reply at 5–7; *see also* 5 U.S.C. § 704.  "[I]n cases such as this one, in which judicial review is sought under the APA rather than a particular statute prescribing judicial review, the requirement of final agency action is not jurisdictional."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805–06 (D.C. Cir. 2006) (citation omitted) (cataloguing cases).  A court thus may assume, without deciding, that a government action is a "final agency action."

honor or commemorate the . . . Confederacy . . . or any person who served voluntarily with the [Confederacy] from all assets of the Department of Defense."  NDAA § 370(a).  A standard contemporary dictionary defines "implement" as "to carry out" or to "accomplish," especially "to give practical effect to and ensure of actual fulfillment by concrete measures."  *Implement*, Merriam-Webster (2023); *see also Implement*, Oxford Eng. Dictionary (2023) ("to complete, perform, carry into effect"; "to fulfil"; "to carry out, execute").  The word "implement" thus signals unmistakably that the Secretary of Defense's obligation is to take steps to put into practice the Naming Commission's plan.

NDAA § 370 is titled "Commission on the Naming of Items of the Department of Defense that Commemorate the Confederate States of America or Any Person Who Served Voluntarily with the Confederate States of America," and appropriately assigns most of the duties and obligations delineated therein to the Commission.  The Commission, for example, has the authority to "develop procedures and criteria to assess whether an existing name, symbol, monument, display, or paraphernalia commemorates the [Confederacy] or person who served voluntarily with the [Confederacy]" and assess the costs of any associated renaming or removal. NDAA § 370(c)(1)–(2).  The Commission is charged with "recommend[ing] procedures for renaming assets" and "develop[ing] a plan to remove names, symbols, displays, monuments, or paraphernalia," which must be presented to Congress "not later than 90 day before" the plan's implementation.  *Id.* § 370(c)(3)–(4), (g).  The Commission is required to include in this plan "procedures and criteria for collecting and incorporating local sensitivities associated with naming or renaming of assets" and to "define what constitutes a grave marker," which is exempt from the Act.  *Id.* § 370(c)(5), (j).  Whereas "claims under 5 U.S.C. § 706(2) are meant to allow a court to 'judge the agency's exercise of discretion,'" Defs.' Supp. Br. at 2, ECF No. 32 (quoting

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), DOD's authority under NDAA § 370 is limited to "implementing" the Commission's recommendations—not making, reviewing, or altering them, *see* Defs.' D.A. Mot. at 9, 19; Defs.' PI Opp'n at 9.

*Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112 (D.D.C. 2022) (DLF), though not binding, is instructive and persuasive.  There, plaintiff brought an APA challenge against the United States, the Department of Homeland Security and its Secretary, and the Chief Patrol Agent for the San Diego Sector of Customs and Border Protection, alleging that the government's decision "to terminate the construction contracts and abandon work on the partially finished border fence" was arbitrary and capricious in violation of the APA.  *Id.* at 116. The Court disagreed, explaining that the agency responsible for the decision to stop construction "followed an unambiguous statutory and executive command, and thus its actions cannot be considered arbitrary and capricious."  *Id.* at 122.  Specifically, 10 U.S.C. § 2808(a) grants DOD emergency construction authority during a national emergency but makes clear that "[t]he decision to end a national emergency belongs to the president, not an agency."  *Id.* (citing 10 U.S.C. § 2808(a)).  When the emergency ends, 10 U.S.C. § 2808(f) provides that "[t]he authority described in subsection (a) shall terminate."  Interpreting this language, the Court concluded that "§ 2808 leaves no room for agency discretion, nor does it specify any factors that the Secretary must consider in deciding whether to terminate a construction project."  *Id.*  Rather, even though DOD affirmatively "halted its § 2808 border project," that decision merely "tracked § 2808(f)'s command."  *Id.* at 122–23.

The same is true here.  NDAA § 370 unambiguously delineates DOD's limited role: (1) establish the Commission; (2) appoint four members; and (3) "implement" the Commission's plan.  Nothing in the statute instructs DOD to review the Naming Commission's

recommendations or to police its compliance with NDAA § 370, nor does the statute provide instruction, guidance, or factors to consider in conducting any such review.  *Cf. State Farm*, 463 U.S. at 42–43 (explaining that an agency decision that fails to consider "relevant factors" or "has relied on factors which Congress has not intended it to consider" may be arbitrary and capricious).  Nowhere in the statute is DOD given the authority "to *decide not to implement* the Naming Commission's plan or to *decide against the removal* of the Confederate Memorial." Defs.' Hudson Mot. at 13 (emphases in original); *see also* Defs.' D.A. Mot. at 11 ("There is no language of discretion anywhere in the statute that would have permitted DOD or the Army to refuse the Naming Commission's plan on grounds that it misinterprets the statute or on any other grounds.").  Rather, NDAA § 370 states expressly and without qualifications that the Secretary of Defense "shall implement" the Naming Commission's plan and "shall . . . remove all names, symbols, displays, monuments, and paraphernalia that honor or commemorate" the Confederacy, which is to be defined by the Naming Commission.  NDAA § 370(a), (c)(2).  Once the Commission has made its recommendation, NDAA § 370 leaves DOD no discretion on the question whether to comply.  *See* Defs.' Supp. Br. at 3 ("DOD only had discretion as to manner of implementation of the Commission's recommendation, not *whether* to implement the recommendation at all.").[9]

Where the government does not have discretion or decisionmaking power, the APA is not the appropriate vehicle for review.  *See State Farm*, 463 U.S. at 52 (explaining that the core question in an arbitrary and capricious challenge is whether the agency's decision was "the

---

[9]     As a policy matter, this limited role for DOD makes sense, since the Naming Commission was established to remove and rename DOD assets that honor or commemorate the Confederacy, *see* NDAA § 370(a), and permitting DOD to ignore the Commission's recommendations would defeat a purpose of establishing the Commission: to remove DOD from the decisionmaking and associated political and cultural cross-winds implicated by the recommendations.

product of reasoned decisionmaking"); *cf. Heckler*, 470 U.S. at 829 ("[T]he primary scope of review prescribed by § 706(2)(A) [is] whether the agency's action was 'arbitrary, capricious, or an *abuse of discretion*.'").  Plaintiffs' claims are dismissed because the October 2022 Memorandum "implemented" the Naming Commission's recommendations, which was precisely what NDAA § 370(a) authorized and instructed Secretary Austin to do.  The October 2022 Memorandum was thus not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).[10]

---

[10]     Even if plaintiffs' interpretation of NDAA § 370(a) was accepted and the Court concluded that DOD had an independent obligation to review the Commission's recommendations, plaintiffs would still not prevail and their claims would still be dismissed because the recommendations satisfied NDAA § 370(g) and (j) and were thus not arbitrary or capricious or in excess of statutory authority.  The NDAA requires the Commission to include in its written report "[m]ethods of collecting and incorporating local sensitivities associated with the removal or renaming of assets."  NDAA § 370(g)(4).  The Final Report explains that "to collect and incorporate local sensitivities," the Naming Commission solicited input in a variety of ways, including "visit[ing] every installation under consideration for renaming or that was known to possess Confederacy-affiliated assets," "engag[ing] with base leaders, personnel and other on-post stakeholders," "with local community leaders and other off-post stakeholders," with "installation commanders, military personnel, leaders and other stakeholders from each community," and with "senators, representatives, and governors for the respective states" to provide information and collect their feedback; and establishing a website that received over 34,000 submissions for the purpose of "allowing anyone to provide installation name recommendations (or other feedback) directly to the Commission from September 4 and December 1, 2021" and "ensur[ing] that those [the Commission] [was] not able to meet—and the American public at large— were afforded an opportunity to have their voices heard in this process."  Final Report at 5–6.

        Further, while NDAA § 370(j) exempts grave markers from renaming and removal, the Naming Commission is authorized to "define what constitutes a grave marker," and the NDAA imposes no guiding principles or limitations on any such definition.  In accordance with NDAA § 370(j), the Commission defined grave marker as: "Markers located at the remains of the fallen.  A marker, headstone, foot stone, niche cover, or flat marker containing inscriptions commemorating one or more decedents interred at that location."  *Id.* at 6; *see also id.* at 55 n.2.  Although the Commission was not required under NDAA § 370(j) to explain the reasons for this definition, the Commission explained that this definition was fashioned to be "in line with the existing 38 U.S. Code § 2306 – Headstones, markers, and burial receptacles," after the Commission "received a briefing from the Office of Army Cemeteries in April 2021 which provided information on definitions of markers, memorials, and monuments and relevant statutes, regulations, and policies in order to better understand and develop what constitutes a grave marker."  *Id.* at 6.  In concluding that the Memorial is "within its remit," the Commission found that the Memorial did not fall within its definition of grave marker.  *Id.* at 15.  Finally, plaintiffs' allegations with respect to NDAA § 370(j)—that the memorial is a "grave marker" because Sir Moses Ezekiel, the Memorial's creator, was buried "at the base," *see* D.A. Compl. ¶¶ 47, 113; Hudson Compl. ¶ 43; *see also* Pls.' PI Mem. at 4; Pls.' PI Reply at 7—is notable, in light of the fact that the Final Report recommended removing the statute on top of the Memorial and all its bronze elements but recommended "leaving the granite base and foundation [of the Memorial] in place to minimize risk of inadvertent disturbance of graves," *id.* at 16; *see also* Final EA at 43–44 ("Since the proposed undertaking is intended to remove only the Memorial, the granite base would remain in place and would still mark the spot where this resource once stood.").

Plaintiffs takes issue with this interpretation, arguing that it effectively makes agency action unreviewable. *See* Pls.' D.A. Opp'n at 7; Pls.' PI Reply at 1–2. To be sure, there is "a strong presumption that Congress intends judicial review of administrative action." *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (citation omitted). This presumption, however, has never stood for the proposition that every plaintiff is allowed to bring every cause of action against every defendant. Rather, the presumption simply provides that Congress is not presumed, absent clear and convincing evidence to the contrary, to have fully precluded review of certain agency decisions. *See id.* at 509–10; *cf. Heckler*, 470 U.S. at 828 (explaining that 5 U.S.C. § 701(a)(1) "requires construction of the substantive statute involved to determine whether Congress intended to preclude review of certain decisions").

Concluding here that plaintiffs' two APA claims fail does not preclude judicial review of any specific administrative action. *See* Defs.' Supp. Br. at 2 ("Defendants' position regarding DOD's lack of discretion to implement the Naming Commission's recommendations is cabined to the specific [APA] claims brought by Plaintiffs here."). Without suggesting or opining in any way on their merits, plaintiffs had—and still have—numerous ways to challenge the Naming Commission's recommendations and the DOD and the Army's roles in "implementing" these recommendations. *See id.* at 2–4 (cataloguing other potential claims); *cf.* 5 U.S.C. § 704 (explaining that parties are entitled to "judicial review" of "final agency action for which there is no other adequate remedy in court"). Plaintiffs, for example, could have directly challenged the Naming Commission's recommendation under the APA as arbitrary and capricious or contrary to law, the methods by which the DOD and Army implemented the Naming Commission's recommendations, NDAA § 370's constitutionality, or the propriety of Congress's delegation to the Commission in the first instance. That plaintiffs chose to bring an APA challenge against

defendants, approximately two years after the Commission was first formed, for defendants' implementation of the Naming Commission's recommendations was a strategic choice—not the only option.

In sum, DOD's issuance of the October 2022 Memorandum, which "implemented" the Commission's recommendations, as NDAA § 370 instructs, was not arbitrary and capricious or in excess of statutory authority.[11]

## C.     Claims Under NEPA and NHPA (Counts III and IV)

Since NEPA and NHPA contain no private right of access, actions alleging violations of both statutes "must be brought under the APA." *Kaarst Env't Educ. & Prot., Inc. v. Env't Prot. Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  NEPA and NHPA both require agencies to comply with certain procedural requirements before undertaking certain major actions.  Their purpose is "to ensure fully formed and well-considered decisions by federal agencies"—not to "mandate particular results." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (alterations in original accepted and citations omitted); *see also Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003).  Whereas NEPA requires agencies to consider the reasonably foreseeable environmental impacts of a proposed major federal action and to consider alternatives to the proposed action, *see Gulf Restoration Network*

---

[11]     As plaintiffs' APA claims fail, so too their claims for violations of FACA, which are brought as part of the arbitrary and capricious APA count.  *See* D.A. Compl. ¶ 104; Hudson Compl. ¶ 106.  Plaintiffs do not appear to bring independent claims under FACA, but for the avoidance of doubt, to the extent plaintiffs bring independent claims under FACA, they fail because FACA does not provide a cause of action.  *See Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017) (cataloguing cases).

In addition, plaintiffs argue, for the first time in opposition to defendants' motion to dismiss, that DOD's actions are ultra vires.  *See* Pls.' D.A. Opp'n at 16–17.  Plaintiffs' complaints do not raise an ultra vires statutory challenge, and plaintiffs cannot do so the first time in their opposition.  *See Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec'y*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) (refusing to address an argument raised by plaintiff "for the first time" in opposition; and explaining that "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss" because "[t]o hold otherwise would mean that a party could unilaterally amend a complaint at will").

*v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (citing 42 U.S.C. § 4332(2)(B)–(C)), NHPA

requires agencies to consider the effect of an undertaking on any historic property, *see Oglala*

*Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 296 (D.C. Cir. 2022) (citing 54

U.S.C. § 306108).

    NEPA and NHPA share "operational similarity," *Kaarst Env't Educ. & Prot.*, 475 F.3d at

1295, and the "touchstone" of whether either applies is "discretion" because the "[t]he twofold

purpose" of such procedural statutes is "to inject [certain] considerations into the federal

agency's decisionmaking process and to inform the public that the federal agency has considered

[these] concerns in its decisionmaking process," *Citizens Against Rails-to-Trails v. Surface*

*Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) (citation omitted).  When an agency has

"discretion," additional information may "cause the agency to modify its proposed action," but if

"the agency does not have sufficient discretion to affect the outcome of its actions, and its role is

merely ministerial, the information that NEPA [or NHPA] provides can have no effect on the

agency's actions," and thus NEPA and NHPA are "inapplicable."  *Citizens Against Rails-to-*

*Trails*, 267 F.3d at 1151.[12]

    Plaintiffs allege that defendants should have followed NEPA and NHPA procedures

before implementing the Naming Commission's recommendations.  *See* D.A. Compl. ¶¶ 118–31;

Hudson Compl. ¶¶ 115–21.  As explained in detail above, however, defendants did not have

discretion under NDAA § 370 to choose not to implement the Commission's recommendations.

*See, e.g.*, *Rancho Vista del Mar*, 640 F. Supp. 3d at 124.  Since neither NEPA nor NHPA apply

to nondiscretionary agency action, plaintiffs have failed to state a claim under either statute.

---

[12]      Consistent with this reasoning, 40 C.F.R. § 1508.1(q)(1) explicitly excludes from its definition of a "major
federal action" to which NEPA applies, any "activities or decisions that are non-discretionary and made in
accordance with the agency's statutory authority."  40 C.F.R. § 1508.1(q)(1)(ii).

IV.     CONCLUSION

Under NDAA § 370, the Naming Commission is required, among other things, to "develop a plan" to remove "names, symbols, displays, monuments, and paraphernalia to assets of the Department of Defense that commemorate the Confederate States of America or any person who served voluntarily with the Confederate States of America," and "present a briefing and written report" outlining its plan to Congress.  NDAA § 370(c)(4), (g).  At least 90 days after this briefing and written report, but "[n]ot later than three years after the date of the enactment of this Act," "the Secretary of Defense" is required to "implement the plan . . . and remove all [such] names, symbols, displays, monuments, and paraphernalia."  *Id.* § 370(a), (g).

On September 19, 2022, the Naming Commission published the third and final part of its report to Congress, which concluded, *inter alia*, that the Confederate Memorial at ANC was a monument "within its remit" and needed to be removed.  Final Report at 16.  On October 6, 2022, Secretary of Defense Lloyd Austin issued a memorandum "concur[ring] with the Naming Commission's recommendations," and "committ[ing] to implementing all of the Commission's recommendations as soon as possible"—precisely what NDAA § 370 instructed him to do.  His actions were thus neither arbitrary or capricious nor in excess of his statutory duty.

According, for the foregoing reasons, defendants' Motions to Dismiss, ECF Nos. 10, 29, are **GRANTED**, and plaintiffs' Motion for a Preliminary Injunction, ECF No. 27, is **DENIED AS MOOT**.

Date:  December 12, 2023

_____
**BERYL A. HOWELL**
United States District Judge